```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CORINNE ROBERTS, o/b/o C.R., a minor,           :
                                                :
                        Plaintiff,              :
                                                :           MEMORANDUM AND ORDER
           -against-                            :           10-CV-0092 (DLI)
                                                :
MICHAEL J. ASTRUE,                              :
Commissioner of Social Security,                :
                                                :
                        Defendant.              :
-----------------------------------------------------------------x
```

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Corinne[1] Roberts filed an application on behalf of her thirteen-year-old son, C.R., for supplemental security income ("SSI") under the Social Security Act (the "Act") on August 17, 2005. By a decision dated June 26, 2008, Administrative Law Judge Hazel C. Strauss ("ALJ"), concluded that Plaintiff was not disabled within the meaning of the Act. On June 4, 2009, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. Plaintiff filed the instant action seeking judicial review of the denial of benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner now moves for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c), seeking affirmation of the denial of benefits because the ALJ properly determined C.R. was not entitled to SSI benefits. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's cross-motion is denied.

---

[1] The court notes that Corinne is incorrectly spelled "Corrine" in several documents in the instant action, including the ALJ's decision.

## BACKGROUND

I. **Non-medical and Testimonial Evidence**

   *A. Questionnaires and Written Reports*

   On August 17, 2005, Plaintiff filed an application for SSI on behalf of her son, C.R., who was born on April 17, 1992. (*See* Administrative Record ("R.") 127.) C.R. had been diagnosed with diabetes mellitus, type 1[2] in November 1999. (R. 138.) As part of her application, Plaintiff completed a function report (Form SSA-3379-BK) and indicated that C.R. was limited in his ability to play sports because, as a result of his diabetes, his blood sugar level dropped with an increase in physical activity. (R. 127, 130.) As a result of the drop in C.R.'s blood sugar level, C.R. would have to stop playing and eat something right away to increase his blood sugar. (R. 130-32.) Plaintiff indicated that she administered the necessary medication and that C.R. did not want other students to know about his diabetes. (R. 133.) However, Plaintiff indicated that C.R.'s diabetes did not negatively affect or limit his attention span, his ability to care for his personal needs and safety, or his ability to understand and apply what he had learned in school. (R. 132-34.) Plaintiff also indicated that C.R. had friends his own age and generally got along with his brother, his classmates and his school teachers. (R. 131.)

   *B. Testimonial Evidence*

   Plaintiff and C.R. both testified at a hearing held before the ALJ on November 13, 2007, at which Plaintiff's counsel was also present. (R. 31.) Plaintiff and C.R. testified that they considered C.R.'s diabetes debilitative because his blood sugar level would drop and he would become tired and dizzy when he participated in physical activity. (R. 35, 63.) C.R. admitted to

---

[2] Diabetes mellitus, type 1 is a form of diabetes mellitus in which there is a complete or almost complete loss of the ability to produce insulin. 2 CH-F J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* D-100 (Matthew Bender, 2010).

participating in soccer during gym class because he did not have to exert as much energy as when he exclusively played in the goalie position. (R. 64, 69-70.)

Plaintiff and C.R. further testified that almost every day when C.R. would come home from school, he would need to rest for one to two hours because he felt tired. (R. 41.) Plaintiff would then provide him with a snack or orange juice, which would bring his blood sugar levels back up. (R. 41, 66-67.) C.R. monitored his blood sugar level four times a day and was injected with insulin three times a day. (R. 43.) Although Plaintiff and C.R. testified that C.R. would not take any insulin while at school, he did check his blood sugar level in the school nurse's office, where his glucometer was stored, and Plaintiff was able to record these readings in a log that she maintained. (R. 44, 48-50, 61-62; *see also* R. 235-50.) However, Plaintiff admitted that she had been notified by the school that C.R. had not been compliant with his monitoring regimen. (R. 38.)

Plaintiff stated that C.R. had low blood sugar levels at least twice a week and that these readings were accompanied by complaints of fatigue, blurry eyes and sweating. (R. 55-56.) C.R. testified that he felt symptoms such as hunger and pain in his eyes whenever his blood sugar level dropped too low, which generally occurred three to four times a month. (R. 68-69.) Plaintiff and C.R. testified that C.R.'s blood sugar level generally dropped to the thirties and forties on these occasions, (R. 55, 68), and had dropped as low as twenty-two on one occasion, (R. 47). Plaintiff further testified that she believed that C.R.'s condition had recently "gotten worse" because his blood sugar levels had been persistently low. (R. 57.) Plaintiff was also concerned that C.R.'s sugar levels could be low without manifesting any symptoms. (R. 43.)

C.R. also testified that, during the weekends, unlike during the week, he did not have to take these naps, and usually spent his time playing video games, or going to the movies and

3

shopping mall with his father and brother. (R. 70-72.) On these occasions, C.R. would take public transportation. (R. 71-72.) C.R. also stated that he completed some household chores, including washing dishes, taking out garbage and cleaning his room. (R. 72.)

Academically, C.R. performed well in some areas, but not as well in other areas, such as earth science, which he failed one term due to missed homework assignments. (R. 38-39.) Plaintiff testified that C.R. missed some homework assignments because he was either absent or not feeling well, but both Plaintiff and C.R. reported that he had no behavioral problems in school and was able to care for his personal needs. (R. 39-40, 63.) While Plaintiff admitted that the doctors did not restrict his physical activities and only limited C.R.'s diet, she reported that C.R.'s doctors nonetheless were concerned that C.R. was experiencing hypoglycemia without warning symptoms. (R. 37, 43, 46.) Plaintiff and C.R. also stated that C.R. was uncomfortable with his diabetes and did not want any of his classmates or peers to know about his condition. (R. 35-37, 63).

## II. Medical Evidence

Several doctors submitted reports in the administrative action, including Dr. Habibollah Nazarian, C.R's primary care physician, Dr. Graeme Frank, a pediatric endocrinologist, and Dr. Dimpna San Jose-Santos, a New York state agency pediatrician. The record indicates that Dr. Nazarian had been treating C.R. since at least August 1999. (R. 138, 152.) Dr. Nazarian referred C.R. to Dr. Frank some time prior to January 2005. (R. 204.) On November 4, 2005, Dr. San Jose-Santos completed a Childhood Disability Evaluation Form assessing C.R.'s diabetes, which was her only recorded evaluation of C.R.[3] (R. 169-74.)

---

[3] It is unclear from the record whether Dr. San Jose-Santos evaluated C.R. based on medical records she received from Drs. Nazarian and Frank, or if she administered an in-person evaluation.

*A. Prior to SSI Claim*

C.R. received regular checkups from Dr. Nazarian and had been treated with Neutral Protamine Hagedorn (NPH) insulin, but had no other reported problems. (R. 182-87.) On November 21, 2004, Dr. Nazarian noted that C.R.'s diabetes was under control. (R. 185.) An assessment dated June 9, 2005, by Dr. Nazarian's office to Dr. Frank, noted that Plaintiff needed to be available for C.R.'s care and well-being, especially when C.R. experienced "hypoglycemia, hyperglycemia, or illness," since C.R. was unable to inject the insulin himself. (R. 164.)

On June 13, 2005, Dr. Frank reported that C.R. needed ongoing evaluation and experienced hypoglycemic symptoms twice a week, but had no major problems related to his diabetes. (R. 206.) Dr. Frank also indicated that C.R.'s glycated hemoglobin numbers[4] had improved recently. (R. 206.) An August 8, 2005 comprehensive metabolic panel laboratory test by Quest Diagnostics indicated that C.R.'s blood glucose level was twenty-nine and his HbA1C level was 9.6%. (R. 175-76.)

*B. Post-SSI Claim*

In a New York Disability Determinations report dated September 22, 2005, Dr. Nazarian reported that C.R. was experiencing diabetic symptoms polyphagia (excessive eating), polydipsia (excessive thirst), poor weight gain and tiredness. (R. 152.) However, Dr. Nazarian determined that C.R.'s functioning in fine/gross motor skills, sensory abilities, communication skills and social/emotional skills were age appropriate. (R. 153.) In this report, Dr. Nazarian noted that

---

[4] Hemoglobin (Hb) A1C test measures the average blood glucose control for the past two to three months. According to Dr. Frank, the American Diabetes Association target for HbA1C is less than 8% for children in C.R.'s age group. (R. 200-01.) Current guidelines recommend a treatment goal of less than 7% for diabetic patients, according to American Diabetes Association. Executive Summary: Standards of Medical Care in Diabetes—2010, 33 Diabetes Care (January 2010), http://care.diabetesjournals.org/content/33/Supplement_1/S4.full.pdf+html (last visited 9/12/11).

C.R. felt weak occasionally and that his last HbA1C count was 9.6%. (R. 156-57.) During a February 2007 physical, Dr. Nazarian reported that C.R. was "doing very well" and offered his congratulations because his diabetes was "under control." (R. 191.)

After examining C.R. on October 24, 2005, Dr. Frank reported that his blood sugar numbers had been rather high (especially at bedtime) and prescribed an increased insulin dosage to reduce his bedtime readings. (R. 215-16.) On October 31, 2005, a laboratory test revealed that C.R. had a blood glucose reading of thirty-seven. (R. 203.) In a February 27, 2006 evaluation, Dr. Frank noted that C.R.'s blood sugars were erratic and also reported that he experienced hypoglycemic symptoms twice a week. (R. 78.) In a report dated April 24, 2007, Dr. Frank stated that although C.R.'s HbA1C count (8.1%) was higher than the target rate, it had nonetheless improved since his previous reading. (R. 200.)

In November 2005, Dr. San Jose-Santos, the state agency pediatrician, completed a Childhood Disability Evaluation Form assessing C.R.'s diabetes. (R. 169-74.) Dr. San Jose-Santos concluded that although diabetes was a severe impairment, it did not meet, or medically or functionally equal, any listed impairment. (R. 169.) Dr. San Jose-Santos determined that C.R. had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for oneself. (R. 171-72.) Dr. San Jose-Santos found a less than marked limitation[5] in the domain of health and physical well-being. (R. 172.) Dr. San Jose-Santos reported that while C.R. had occasional weakness and tiredness, there were no reported episodes of hypoglycemia. (*Id.*)

---

[5] A marked limitation is a physical or mental impairment that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

## APPLICABLE LAW

I.  **Standard of Review**

This court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the court need not determine *de novo* whether a claimant is disabled. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). Moreover, "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (quoting *Lamay*, 562 F.3d at 508-09). Therefore, the court must be satisfied "that the claimant has had a full hearing under the . . .

regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Id.* at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

"If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even where substantial evidence supporting the claimant's position also exists." *Hernandez v. Barnhart*, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (citing 42 U.S.C. § 405(g)). "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision.'" *Id.* (quoting *Burris v. Chater*, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).

## II. Governing Social Security Administration ("SSA") Regulations for Defining Childhood Disability

To qualify for SSI benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). The SSA has provided a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924(a); *see also Pollard*, 377 F.3d at 189.

First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). "Second, the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Pollard*, 377 F.3d at 189 (quoting 20 C.F.R. § 416.924(c)). Third, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Id.* (quoting 20 C.F.R. §§ 416.924(c)-(d)). Under the third

step, to demonstrate functional equivalence to a Listing Impairment, the child must exhibit "marked" limitations in two of six domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These six domains consider a child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. §§ 416.926a(a)-(b). A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (quoting 20 C.F.R. § 416.926a(e)(2)(i)). In addition, the regulations provide that a limitation is "marked" when standardized testing shows functioning two standard deviations below mean levels. 20 C.F.R. § 416.926a(e)(2)(i); *see also Pacheco v. Barnhart*, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004). An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation would be found in a domain where the child scores at least three standard deviations below average. *Id.*

In making the decision that C.R. did not have an impairment or combination of impairments that functionally equals the listings, the ALJ was required to consider all the symptoms and the extent to which these symptoms could reasonably have been accepted as consistent with the objective medical and other evidence, based on the requirements set forth in 20 C.F.R. § 416.929 and Social Security Rulings ("SSR") 96-4p and 96-7p. This consideration involves a two-step process: first, the ALJ must determine whether there is an underlying medically determined impairment(s) that could reasonably be expected to produce the claimant's symptoms; second, if the ALJ determines that there is an underlying medical impairment, the

ALJ must evaluate the intensity, persistence and limiting effects of the claimant's ability to perform certain activities. 20 C.F.R. § 416.929(a). Accordingly, the ALJ must assess the credibility of the statements made by Plaintiff and claimant based upon consideration of the entire case record. Pursuant to 20 C.F.R. § 416.929(c), the ALJ must consider all available evidence, including claimant's history, the signs and laboratory findings and statements from claimant or other persons about how the symptoms affect claimant.

## DISCUSSION

### I. ALJ's Decision

The ALJ made the following findings: (1) C.R. was an adolescent on August 17, 2005, the date the SSI application was filed; (2) C.R. was not engaged in substantial gainful employment; (3) C.R.'s diabetes and hypertension constituted severe impairments; (4) C.R. did not have an impairment or combination of impairments that meets, or medically or functionally equals, one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; and (5) C.R. had not been disabled, as defined by the Act, since August 17, 2005. With regard to the six functional domains, the ALJ found that C.R. had no limitations in four domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; and (4) ability to care for himself. (R. 16-19.) The ALJ found that C.R. had a less than marked limitation in the domain of moving about and manipulating objects, (R. 18), and a marked limitation in health and physical well-being, (R. 19).

### II. The ALJ's Decision is Supported by Substantial Evidence

Here, the ALJ correctly followed the three-step procedure to determine that claimant is not disabled. First, she determined that C.R. had not engaged in substantial gainful activity. (R. 16.) Next, the ALJ determined that C.R.'s diabetes and hypertension were severe impairments.

(R. 16.) Finally, she concluded, based on the medical and testimonial evidence presented, that the claimant's severe impairments did not medically or functionally equal a disability, as defined in the SSA listings. (R. 16.) Specifically, the ALJ relied on the reports and diagnoses from Drs. Nazarian and Frank. (R. 19-22.)

Plaintiff, however, argues that the ALJ's decision should be overturned because: (1) the ALJ failed to address the relevant listing, 20 C.F.R. pt. 404, subpt. P, app. 1 § 109.08(B), which provides that diabetes mellitus is considered debilitative when there are "[r]ecent, recurrent episodes of hypoglycemia"; and (2) substantial evidence did not support the ALJ's credibility determinations. The court disagrees. For the reasons set forth below, the court affirms the ALJ's decision.

### A. *The ALJ Sufficiently Addressed Hypoglycemia*

Plaintiff contends that the ALJ did not sufficiently address C.R.'s hypoglycemia under § 109.08(B) to satisfy the third step in the sequential analysis outlined in 20 C.F.R. § 416.924(a). (Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Cross-Mot.") at 15.) However, while the ALJ only briefly mentioned hypoglycemia and failed to specifically address § 109.08(B) regarding juvenile diabetes in her decision, she devoted much of her decision to the medical records from Drs. Nazarian and Frank, both of whom generally agreed that C.R.'s diabetes and hypoglycemia were under control and did not constitute a significant impairment. *See Mantovani v. Astrue*, 2011 WL 1304148, at *2 (E.D.N.Y. Mar. 31, 2011) ("If the treating source's opinion regarding the nature and severity of a claimant's impairments is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record,' the opinion receives 'controlling weight.'") (citing 20 C.F.R. § 404.1502). Even if an ALJ's decision lacks an express rationale for finding

11

that a claimant does not meet a SSA listing, a court may nonetheless uphold the ALJ's decision where portions of the decision and evidence before her indicate that her conclusion was supported by substantial evidence. *See Barry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982); *Jones v. Astrue*, 2010 WL 1049283, at *7 (E.D.N.Y. Mar. 17, 2010).

Moreover, the ALJ reinforced her findings with testimony from Plaintiff and C.R. at the disability hearing, which showed that C.R. was able to participate in gym class, had infrequent absences and did not need to rest on the weekends even though he had an active lifestyle. (R. 21-22.) The ALJ properly relied on this testimony to support her conclusion that C.R.'s limitation did not meet any of the listed impairments. "Although the ALJ might have been more specific in detailing the reasons for concluding that [claimant's] condition did not satisfy a listed impairment, other portions of the ALJ's detailed decision, along with Plaintiff's own testimony, demonstrate that substantial evidence supports this part of the ALJ's determination." *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d Cir. 2010).

Plaintiff relies heavily on a handwritten log she maintained to demonstrate evidence of C.R.'s hypoglycemia. However, the ALJ determined that the evidence in the record failed to establish that C.R.'s physicians believed C.R.'s impairments met the standards listed in § 109.08(B), or that those standards were in fact met. (R. 22-23.) As evidence, the ALJ cited Dr. San Jose-Santos' consultative report, which stated that there were no reported episodes of hypoglycemia. (R. 23.) While Dr. San Jose-Santos found a less than marked limitation in the domain of health and physical well-being, the ALJ admittedly "gave [C.R.] the benefit of the doubt" by finding a marked limitation in this domain based on the fact that he needed to test his blood glucose levels and received insulin several times a day. (R. 23, 169-74.) The ALJ further relied on Dr. Frank's June 13, 2005 medical evaluation, in which he reported that, while C.R.

12

had mild symptoms of hypoglycemia, he had no major problems related to his diabetes. (R. 22, 206.)

Plaintiff argues that Dr. San-Jose Santos had insufficient medical records at the time of her medical evaluation and, thus, the ALJ should not have relied on Dr. San-Jose Santos' opinion at all because the evidence Plaintiff submitted after Dr. San Jose-Santos completed her opinion "conclusively establishes that C.R. in fact was experiencing regular and recurrent episodes [of hypoglycemia]." (Plaintiff's Reply Memorandum ("Pl. Reply Mem.") at 4-5.) Plaintiff, however, misinterprets the law and the facts. The only recorded evidence submitted by Plaintiff after Dr. San-Jose Santos issued her report was Plaintiff's November 2007 testimony and log of C.R.'s blood sugar level, neither of which the ALJ found to be credible in light of conflicting evidence.

Although Dr. San Jose-Santos' evaluation occurred in 2005, the ALJ properly relied on the report to supplement C.R.'s treating physicians' opinions. The opinions of state agency physicians can be "given weight only insofar as they are supported by evidence in the case record." 61 Fed. Reg. 34,466, 34,467 (July 2, 1996) (SSR 96-9p). Dr. San Jose-Santos' consultation was consistent with the prior medical reports from Drs. Nazarian and Frank. The ALJ used the consultative opinion issued by Dr. San Jose-Santos to confirm that C.R.'s treating physicians' assessments were accurate at the time of the SSI application. Because Dr. San Jose-Santos' opinion was consistent with these earlier reports, the ALJ properly "accorded significant weight" to her consultative evaluation. (R. 23.)

In sum, remand is unnecessary despite the ALJ's failure to explicitly discuss § 109.08(B), because the evidence in the record allows the court to ascertain the ALJ's rationale behind her

determination that C.R. was not disabled, and the ALJ's analysis clearly shows she supported her decisions with substantial evidence.

### B. *Substantial Evidence Supports the ALJ's Credibility Determinations*

The second issue Plaintiff raises is whether there is substantial evidence to support the ALJ's credibility determinations. Plaintiff alleges that the ALJ's findings regarding Plaintiff's testimony rested on a selective reading of the record. However, the Commissioner's findings of fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). Furthermore, "[i]t is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir.1982); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (noting that when an administrative decision rests on adequate findings, the court should not substitute its judgment for that of the Commissioner); *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (reasoning that an administrative decision should only be reversed "when it does not rest on adequate findings sustained by evidence having 'rational probative force'") (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 230 (1938)).

In the instant case, the ALJ did not find Plaintiff's testimony regarding the severity of her son's symptoms to be credible. (R. 21.) Instead, the ALJ determined that, while the record established the existence of medically determinable impairments that could reasonably be expected to cause the symptoms alleged, the allegations regarding the intensity, frequency and limiting effects of these symptoms were exaggerated and inconsistent with other evidence in the record. (*Id.*) The ALJ found one such inconsistency regarding C.R.'s ability to engage in physical activity without major restrictions or limitations. In her November 2007 testimony, Plaintiff and C.R. stated that C.R.'s blood sugar level would drop and he would become tired and

dizzy when he participated in physical activity, and he would need to rest when he came home from school due to exhaustion. (R. 41, 35, 63.) However, C.R. admitted during his testimony that he did not need to nap on the weekends and that he takes public transportation to the mall and the movies on the weekends. (R. 70-72.) He also testified that he washes dishes, takes out garbage, cleans his room and plays video games. (R. 72.) Thus, the ALJ relied on this information to support her assessment that C.R. could complete a full array of daily activities without major restrictions or limitations. (R. 21-23.)

The ALJ also found inconsistencies between the testimony provided at the November 2007 hearing and C.R.'s school records. Plaintiff testified, and C.R. confirmed, that he would test his blood sugar level during lunch at school, even if the nurse was not in the office. (R. 37-38, 61.) The ALJ noted that, to the contrary, C.R.'s school records indicated that there were numerous testing "no shows" and the school informed Plaintiff of this recurring non-compliance. (R. 23). Although C.R. testified that his mother would inform the school when C.R. would test himself outside the nurse's supervision, the ALJ found no records to support this assertion. (R. 23.) Based on these inconsistencies, the ALJ determined that the testimony of Plaintiff and C.R. regarding the severity of C.R.'s symptoms was not credible. (R. 21.)

In addition, the ALJ supplemented her determinations with information that she received from C.R.'s school and physicians. As discussed above, Plaintiff testified that her son's diabetes affected his ability to participate in physical activities and complete his schoolwork. (R. 35.) However, the ALJ found evidence to the contrary to be persuasive. In particular, the ALJ noted that C.R.'s gym teacher reported that he had "good class participation." (R. 149.) Likewise, the ALJ reviewed school attendance records that showed C.R.'s absences were limited. (R. 39, 163.) Furthermore, the ALJ found the opinions of C.R.'s physicians to be convincing; she determined

that "the medical records show that claimant's condition is treated and that there are no systematic complications." (R. 23). In addition, the ALJ cited several physician evaluations, including Dr. Frank's determination that C.R. had no major problems with his diabetes and Dr. Nazarian's "diagnosis of diabetes with normal functioning." (R.22.) Accordingly, it is apparent that the ALJ considered all of the evidence and ultimately gave special consideration to C.R.'s treating physicians.

Basing her decision on the testimony, medical reports, and school records, the ALJ determined that the totality of the information did not support the alleged symptoms of tiredness. As a result, the ALJ's credibility decision must be upheld.

## **CONCLUSION**

In sum, there is substantial evidence in the record here to support the Commissioner's final decision. Thus, for the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted, and Plaintiff's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is affirmed.

SO ORDERED.

Dated: Brooklyn, New York
September 12, 2011

/s/
DORA L. IRIZARRY
United States District Judge